UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:18-CR-00311 (JCH) |
| | : | |
| v. | : | |
| | : | |
| RON CHRISTOPHER SPEAR-ZULETA, | : | |
| a.k.a.  "CHRIS", ANINHA SPEAR-ZULETA, | : | APRIL 19, 2021 |
| and MARITZA TORRES, a.k.a. "LISY" | : | |

UNITED STATES' MEMORANDUM IN AID OF SENTENCING
RE: RON CHRISTOPHER SPEAR-ZULETA

## I.    OFFENSE OF CONVICTION

A second superseding indictment charged the defendant Ron Christopher Spear-Zuleta ("Spear-Zuleta") with Hobbs Act robbery, two counts of kidnapping, and conspiracy to commit those offenses. On September 11, 2019, a week before trial was scheduled to begin, he and both co-defendants entered guilty pleas. Pursuant to a written plea agreement, the defendant pled guilty to count one of the indictment, charging his violation of the Hobbs Act by "unlawfully tak[ing] and obtain[ing] personal property consisting of a firearm, United States currency, cocaine, and other valuables from Alan Robinson, Jr. (Robinson) and Victim 1 against their will by means of actual and threatened force, violence, and fear of injury, immediate and future, to Victim 1." Second Superseding Indictment, paragraph 20. Title 18 United States Code §1951(a).

## II.    FACTS AND CIRCUMSTANCES SURROUNDING THE CRIME

Shortly before 10:00 a.m. on April 4, 2018, Alan Robinson was shot to death on Rimmon Road, Woodbridge, Connecticut, directly in front of the home shared by Spear-Zuleta and his wife,

Aninha Spear-Zuleta ("Aninha"). The Woodbridge Police Department, the Connecticut State Police, and the FBI immediately began to investigate the homicide.

Upon finding Robinson's car parked in the Spear-Zuletas' driveway, officers approached the house in an effort to contact the Spear-Zuletas. Valeriann Phelmetto (Aninha Spear-Zuleta's mother) answered the door and stated that that neither of the Spear-Zuletas were in the home and that she had no idea where they were. Investigators later retrieved video and audio recorded earlier that morning from a motion-activated home security system at the residence. The video showed Alan Robinson standing in front of the home, apparently talking with Chris Spear-Zuleta and Aninha. A subsequent image a few minutes later showed Robinson's body lying on Rimmon Road, directly in front of the home. Succeeding sounds and images from that security system captured the words and actions of both Chris and Aninha Spear-Zuleta as they ran into house immediately after the shooting. Chris Spear-Zuleta can then be seen fleeing the residence in his car. [1]

In trying to determine why Robinson was at the Spear-Zuletas' home on April 4, investigators interviewed Robinson's fiancé, Ashley Branham (victim 1 in the second superseding indictment). Initially, Ms. Branham denied knowledge of any circumstances that might have led Robinson to the Spear-Zuletas, or that may have led to his death. A few days later, however, Ms. Branham admitted that she had not been truthful. In a videotaped interview, she explained that Robinson and Spear-Zuleta had once been partners in trafficking cocaine, but the pair had a falling out in the Fall of 2017. She then told investigators about an incident that occurred several months prior to Robinson's death. Ms. Branham stated that on November 28, 2017, the Spear-Zuletas forced her to take them to the home she shared with Robinson, where they stole a variety of valuable items, including cocaine, money, jewelry, and clothing. Ms. Branham believed that

---

[1]     This video is available for review at the Court's convenience.

Robinson's death resulted from his attempt to recover the items that the Spear-Zuletas stole from him during the kidnapping/robbery.[2]

Ms. Branham identified four individuals who participated in the November 2017 kidnapping/robbery: (1) Chris Spear-Zuleta, (2) Aninha Spear-Zuleta, (3) a woman known to her as "Lisi" (whom she later positively identified as co-defendant Maritza Torres), and (4) an unidentified man ("U/M").

Ms. Branham gave a detailed description of Robinson's and her relationship with the Spear-Zuletas. She had known Aninha since high school and considered her a friend. Through that friendship, Ms. Branham came to know Chris Spear-Zuleta as well. Ms. Branham had often visited the Spear-Zuletas at their home on Rimmon Road in Woodbridge.

The Spear-Zuletas introduced Ms. Branham to Alan Robinson in 2017. Ms. Branham admitted knowing that Robinson sold narcotics, specifically, that he sold cocaine that Chris Spear-Zuleta supplied. In the Fall of 2017 Chris Spear-Zuleta confronted her and said that Robinson was a scam artist. Spear-Zuleta complained that Robinson was too flashy, thereby drawing unwanted attention to their drug business. He added that Robinson owed him thousands of dollars in drug proceeds and that he was cutting off Robinson's drug supply. Ms. Branham reported that shortly after that conversation, she discussed the debt with Robinson, who admitted that he owed Spear-Zuleta money. Thereafter, Robinson gave Ms. Branham $15,000 in cash that she was to turn over to Aninha Spear-Zuleta to settle that debt. Before Ms. Branham could deliver the cash, however, Chris Spear-Zuleta came to her residence unannounced. Ms. Branham gave Chris Spear-Zuleta the payment as directed, but Spear-Zuleta was dissatisfied, claiming that Robinson owed him an additional $40,000.

---

[2]     Both state and federal authorities continue to investigate the homicide of Alan Robinson.

Thereafter, Spear-Zuleta made it clear that he intended to collect Robinson's drug debt in full. On a later occasion, he visited Ms. Branham at work unannounced, and demanded that she turn over the keys to Robinson's car as debt collateral. Spear-Zuleta relented only when Ms. Branham denied having the keys to the car with her; she told investigators that she lied to Spear-Zuleta about the keys so that he would leave, which he ultimately did.

About November 27, 2017, Ms. Branham received a text from Aninha, asking Ms. Branham to come to the Spear-Zuletas' house in Woodbridge, Connecticut, to talk. Given her increasingly uncomfortable interactions with Chris Spear-Zuleta, Ms. Branham feared that Aninha's overtures were a ploy to lure her to Woodbridge, where Chris Spear-Zuleta would continue to pressure her over the drug debt. As a safeguard, Ms. Branham told her mother and a close family friend that she was going to visit Aninha in Woodbridge at a certain time, and that they should call her on her mobile telephone "just in case." In addition to communicating her whereabouts to her mother and her friend, Ms. Branham took with her "Mr. Mike," a developmentally disabled man for whom she provided care.[3] Ms. Branham explained to investigators that in 2017 she worked as an evening caretaker for Mr. Mike. She had taken Mr. Mike to visit the Spear-Zuletas in Woodbridge on other social occasions and they knew of his disabilities.

Ms. Branham and Mr. Mike arrived at the Spear-Zuletas' house about 6 p.m. on November 28, 2017. Once there, Ms. Branham met with Aninha and Chris Spear-Zuleta, who insisted that Ms. Branham go with him to the basement of the house, while Mr. Mike remained upstairs watching television.

---

[3]     Investigators attempted to interview Mr. Mike. Because of cognitive disabilities and severe dementia, however, he is unable to provide an account of what occurred on November 28, 2017.

As they went into the basement, an unidentified man (U/M) followed them. In the basement was Maritza Torres, whom Ms. Branham knew from other social occasions, including gatherings at the home.

Once in the basement, Chris Spear-Zuleta began threatening Ms. Branham. She tried to leave the house at that point, but Spear-Zuleta restrained her and said, "you're not going anywhere!" He then threw her onto a couch and slapped her in the face before the co-defendants intervened.

Chris Spear-Zuleta ordered Torres to assault Ms. Branham, but Torres refused. Spear-Zuleta then began choking Ms. Branham, causing her to fear for her life as she struggled to free herself. As a result of that attack, she sustained scrapes on her knuckles and a gash on her shin. Spear-Zuleta warned her that if she reported the incident to the police, he would bail himself out of jail and kill her, her mother, and grandmother—threats that she believed were genuine.

Having assaulted and threatened Ms. Branham, Chris Spear-Zuleta told Aninha, Torres and the U/M to take Ms. Branham back to the condominium that she shared with Robinson in Milford, Connecticut. Spear-Zuleta told them to take "everything and anything" belonging to Robinson. Before leaving the Woodbridge residence, Aninha took Ms. Branham's personal telephone, which prevented her from calling for help. Ms. Branham also was forced to leave her purse, which contained her employer-issued cell phone, at the Spear-Zuleta household. Using Ms. Branham's car, the U/M then drove Mr. Mike and Ms. Branham to Milford, while Aninha and Torres drove there in a separate car.

Upon their arrival at the Milford condominium, Aninha parked in the garage, while the U/M parked Ms. Branham's car in front of the home. Everyone then entered through the garage and the defendants began ransacking the house. While Torres and Aninha were searching the house

the U/M discovered Robinson's bookbag that contained a large quantity of cocaine, prompting him to exclaim "jackpot."

Shortly thereafter, Ms. Branham's home security alarm sounded. Ms. Branham was immediately told to disarm it, which she did using the physical keypad. Robinson – who was out of town at the time –was alerted remotely and apparently began monitoring the security system through an application on his cellular telephone. The alarm application allowed him to see real-time video of Ms. Branham and the others entering the house. Contemporaneous records from the security company and from Milford Police confirm that Robinson reported that strangers were in his home and that they were deliberately shifting the security cameras to prevent their further use.

Soon, two Milford Police Officers arrived at the residence. Having been told by her captors to "play it cool," Ms. Branham told the officers that there was no burglary and that Robinson was simply upset because she was moving out of the house. She assured them that everything was fine and that she needed no help.

After the officers left the home, Aninha Spear-Zuleta, Torres, and the U/M continued to rifle through Alan Robinson's personal belongings, loading clothing and valuables into Aninha's car. The U/M drove Ms. Branham and Mr. Mike back to the Spear-Zuletas' residence in Woodbridge, where they were released. Aninha and Torres remained at the Milford residence to steal additional items.

The thieves stole cash, a handgun, a pair of Ms. Branham's Louis Vuitton boots, Robinson's clothing, a set of diamond earrings, and the backpack containing drugs. In subsequent searches of the Spear-Zuletas' home conducted after Robinson's homicide, investigators found several clothing items that were stolen from Robinson and Branham during the robbery.

The Connecticut Forensic Sciences Laboratory later determined that Alan Robinson's DNA matched a DNA profile that had been developed from some of those items. Records of the Louis Vuitton Company confirmed that Alan Robinson had purchased a pair of women's Louis Vuitton boots in New York City a few weeks before the robbery.

State of Connecticut authorities obtained arrest warrants for larceny and kidnapping for all three defendants in May 2018. Police arrested Aninha Spear-Zuleta and Torres shortly thereafter, but Chris Spear-Zuleta fled Connecticut. After a lengthy investigation spanning the United States from Florida to California, the FBI arrested him on December 22, 2018 in San Francisco, where he had been living and travelling under a variety of false identities.

## III.  **STATUTORY PENALTIES**

A violation of the Hobbs Act carries a maximum penalty of 20 years' imprisonment; a term of supervised release of not more than 3 years, to begin after any term of imprisonment; a maximum fine of $250,000; and a special assessment of $100.

## IV.  **SENTENCING GUIDELINES CALCULATION**

Base offense level 20. The Presentence Report issued December 18, 2019, ("PSR") (docket no. 197-3) properly identifies a United States Sentencing Guidelines (U.S.S.G.) base offense level of 20 for the crime of conviction, Interference with Commerce by Robbery, 18 U.S.C. § 1951(a). U.S.S.G.§ 2B3.1(b)(4)(A), ¶ 22.

Undisputed enhancements. The PSR recommends a 2-level enhancement for leadership role, §3B1.1(c), PSR ¶ 27, which Spear-Zuleta does not contest.

Contested enhancements. Additionally, the PSR recommends application of additional enhancements, which Spear-Zuleta does challenge:

- +2 levels (threat of death), §2B3.1(b)(2)(F), PSR ¶ 23.[4]
- +4 levels (abduction to facilitate the crime), § 2B3.1(b)(4)(A), PSR ¶ 24;
- +1 level (theft of firearm and controlled substances), § 2B3.1(b)(6)(A), PSR ¶ 25;
- +2 levels (harm against a vulnerable victim), §3A1.1(b)(1), PSR ¶ 26;

For the reasons discussed below, Ms. Branham's testimony at the *Fatico* hearing on February 23, 2021, thoroughly supported each of the disputed enhancements.

<u>Criminal History</u>. Based on an initial assessment, the parties believed Spear-Zuleta fell within Criminal History Category V. But the PSR correctly determined that he properly falls within the highest recidivist category, CHC VI. PSR ¶ 60. Based on that discrepancy, Spear-Zuleta argues for a departure pursuant to *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989). The Government acknowledges that a *Fernandez* departure is the typically, though not automatically, granted in these circumstances.

<u>Acceptance of responsibility</u>. Spear-Zuleta pleaded guilty only on the eve of trial. Unlike his co-defendant, Aninha Spear-Zuleta, he did not admit that any of the any enhancements should be applied to the Sentencing Guidelines base offense level. The parties' plea agreement expressly states that the Government opposes the 2-level reduction for acceptance of responsibility typically afforded under U.S.S.G. § 3E1.1(a). PSR ¶ 31.

In addition to a belated plea, Spear-Zuleta's post-plea conduct is inconsistent with acceptance of responsibility. As this Court is aware, he moved to withdraw his guilty plea on January 1, 2020, docket no. 199, that motion was further amended on June 2, 2020, docket no. 230. This Court denied that relief by written order, dated July 31, 2020, docket no. 239. Despite this Court's ruling,

---

[4]     At the government's suggestion the PSR also recommends adding two levels because the victim sustained bodily injury. Based on Ms. Branham's testimony at the *Fatico* hearing, the government no longer believes that such an enhancement is supported.

however, Spear-Zuleta again moved to withdraw his plea, see docket no. 253. This Court again denied relief on January 12, 2021, docket no. 256.

In the Government's view, Spear-Zuleta's attempt to withdraw his plea, not once but twice, is not consistent with continuing acceptance of responsibility, and is firm ground for denying the 2-level reduction.[5] *See United States v. Hirsch,* 239 F.3d 221 (2d Cir. 2001) ("An attempt to withdraw a plea, although not automatically disqualifying a defendant from seeking an adjustment … is a well-established ground for denying the adjustment"); *see, e.g., United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) ("Here, the district court based its decision to withhold an acceptance of responsibility adjustment on [defendant's] ill-fated attempts to withdraw his plea. Longstanding precedent permits district judge to withhold the adjustment for that reason alone); *United States v. Acton*, 556 Fed. App'x 830, 832 (11th Cir. 2014) (same); *United States v. Bastian*, 603 F.3d 460 (8th Cir. 2010)("A defendant's attempt to withdraw his guilty plea may be evidence

---

[5]     Spear-Zuleta's first motion to withdraw posited that he was "legally" innocent of Hobbs Act robbery arguing the mere taking of clothing from a private residence did not sufficiently affect interstate commerce. Accordingly, his motion claims to challenge only the application of federal law to his offense, rather than assert his factual innocence. But that argument is an attempt to dance between raindrops. For all practical purposes, the first motion to withdraw was a factual refutation of Ashley Branham's critical testimony: namely, that the items stolen from her home were proceeds of Spear-Zuleta's and Robinson's drug-trafficking enterprise. That essential fact (and her averments that a valuable quantity of cocaine was stolen) provides the factual basis for his conviction. Spear-Zuleta moved to withdraw his plea by implicitly arguing that Branham was not a credible witness and that her claims about the drug-motive for the robbery were entirely fabricated. In short, he denied any responsibility for committing a Hobbs Act drug robbery and challenged the government to prove otherwise.

Further, his second motion to withdraw leaves no doubt that he objected to and intended to challenge the underlying facts of his crime (i.e., to assert his factual innocence). In that filing he directly challenged Branham's credibility, arguing that the drug-related motive for the robbery was the product of favorable treatment by the State's Attorney's Office. Finally, even after the denial of his motions, he has continued to deny essential facts of the robbery and to put the Government to its proof by demanding a *Fatico* hearing and continues, even now, to challenge virtually every enhancement derived from Branham's fact testimony.

Although the PSR recommends a 2-level reduction (PSR ¶ 31), that recommendation is clearly predicated on a PSR interview conducted October 10, 2019, well before the motions to withdraw. PSR ¶ 19.

that he did not accept responsibility for his offense for purposes of base offense level decrease for acceptance of responsibility).

The PSR's Guidelines range. Based on a total adjusted offense level of 29 (assuming acceptance of responsibility) and CHC VI, the PSR calculates an applicable Guidelines range of 151 to 188 months' imprisonment. PSR ¶ 87.

The Government's Guidelines range. Without acceptance, the total adjusted offense level is 31; based on a CHC V, the Government calculates an applicable Guidelines range of 168 to 210 months' imprisonment.

The defendant's Guidelines range. Spear-Zuleta advocates for a 2-level reduction for acceptance and the denial of all enhancements except the 2-level enhancement for "leadership role," for a total adjusted offense level of 20; he further argues for a departure to CHC V, which yields a Guidelines range of 63 to 78 months' imprisonment. *See* Def's Sent. Mem. at 2, docket no. 303.

## V.   GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS

### A.  Threat of death – U.S.S.G. §2B3.1(b)(2)(F)

The Sentencing Guidelines specifically call for an increase in the base offense level for robbery "if a threat of death was made." U.S.S.G. §2B3.1(2)(F). Application Note 6 states: "[T]he intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death." *See United States v. Jennette,* 295 F.3d 290, 291 (2d Cir. 2002). Whether the defendant in fact intended to kill the victim is immaterial. "The enhancement does not require a subjective finding of the defendant's intent, nor does it require an actual finding of

the level of fear instilled by the threat." *United States v. Cadotte,* 57 F.3d 661,662 (8th Cir. 1995).

As Chris Spear-Zuleta was assaulting Ashley Branham in the basement of the Woodbridge home, he threatened to kill her and threatened to kill her mother and her grandmother if she reported the crime to the police. Although he was not armed at the time, he already had physically overpowered her, choked her, and had to be restrained from further assaulting her. All this happened while she was alone in the basement of the defendant's home, without her phone or car keys, thus leaving her unable to escape or summon help. The fear that the defendants instilled caused Ms. Branham to acquiesce in the demand that she provide the co-conspirators access to her Milford home so that they could carry out the robbery.

## B.  Abduction – U.S.S.G. § 2B3.1(b)(4)(A)

The Sentencing Guidelines call for a four-level enhancement to the recommended guidelines range for any person who, in the course of a committing a Hobbs Act robbery, abducts a victim. U.S.S.G. §2B3.1(b)(4)(A). "'Abducted' means that a victim was forced to accompany an offender to a different location." U.S.S.G. §1B1.1.

The United States Court of Appeals for the Third Circuit has identified three predicates to determine whether that standard is met:

> First, the robbery victims must be forced to move from their original position; such force being sufficient to permit a reasonable person an inference that he or she is not at liberty to refuse. Second, the victims must accompany the offender to that new location. Third, the relocation of the robbery victims must have been to further either the commission of the crime or the offender's escape.

*United States v. Reynos,* 680 F.3d 283, 286-87 (3d Cir. 2012); quoted in *United States v. Smith,* 767 F.3d 187, 190 (3d Cir. 2014).

The facts here could hardly be more on point with either the commonsense definition of "abduct" set forth in the Guidelines, or the more legalistic standard that the Third Circuit imposes. Ashley Branham unequivocally testified at the *Fatico* hearing on February 23, 2021, that Aninha Spear-Zuleta summoned her to the Spear-Zuletas' Woodbridge home on November 28, 2017. Transcript, 2/23/21 (*Tr.*) at 31. **Ms. Branham brought with her "Mr. Mike," a developmentally disabled man for whom she cared as part of her job responsibilities with Marrakech, Inc.** *Tr.* at 27.  **"Mr. Mike," suffers from both dementia and autism. At the Spear-Zuletas' home, Chris Spear-Zuleta** led her to the basement and "started yelling and screaming." *Tr.* at 31. When Ms. Branham said that she was leaving "[h]e told me that I wasn't going anywhere." *Id.* "He then started pushing me, he hit me, I fell back. He then tried to chock [sic] me." *Id.* It was only the intervention of his coconspirators that caused the defendant to cease his attack. The defendant then ordered one of the conspirators to take Ms. Branham's cell phones and her car keys. *Tr.* at 33. Ms. Branham stated she surrendered her keys only "[b]ecause at that moment [I] was outnumbered. It was four people against me and I didn't want anything to happen." *Tr.* at *34.*

After Chris Spear-Zuleta assaulted and threatened Ms. Branham and her family, he told his coconspirators to take her to the home she shared with Alan Robinson and to "take everything that belonged to Alan. Anything that he ever bought me." *Id.* Following his instructions, Aninha and the others did exactly that, taking her and "Mr. Mike" to Ms. Branham's Milford home where they held her against her will while cleaning out all of Robinson's belongings. Only after the coconspirators accomplished their goal did they return her and Mr. Mike to the defendant's Woodbridge home, where she was allowed to leave. *Tr.* at *35.*

The conspirators took Ms. Branham and Mr. Mike by threat of violence and death from her original location – the defendants' Woodbridge home – to her home in Milford and held her there as they effectuated the robbery of Alan Robinson's belongings. In any sense of the word, they abducted her and "Mr. Mike."

### C.  Theft of firearm or controlled substances – U.S.S.G. §2B3.1(b)(6)(A)

Guidelines section 2B3.1(b)(6)(A) imposes an additional one-level enhancement if "a firearm … or controlled substance was taken."

Ashley Branham testified without contradiction that the defendant and her coconspirators took both a firearm and a significant quantity of narcotics from her home in an effort to recoup a drug debt that Robinson owed Chris Spear-Zuleta. *Tr.* at 38. "In the back of the closet, when they were going taking all his stuff out, they removed his laundry basket and behind that was a book bag full of cocaine." *Id.* She further testified that when she returned to the home after being released, she found that they had also taken a firearm that Robinson stored under the mattress. *Tr.* at 43. Robinson later told her that he had retrieved the stolen narcotics from the Chris Spear-Zuleta in return for giving him a Rolex watch. *Id.*

### D.  <u>Vulnerable Victim – U.S.S.G. §3A1.1(b)(1)</u>

If a person convicted of robbery "knew or should have known that a victim of the offense was a vulnerable victim," the Guidelines call for the base offense level to be increased by two levels. U.S.S.G. §3A1.1(b)(1). One is considered to be vulnerable if he or she "(A) … is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." U.S.S.G §3A1.1 cmt. n. 2.

As noted, when Aninha Spear-Zuleta summoned Ashley Branham to her Woodbridge home, Ms. Branham brought with her Mr. Mike, who suffers from both dementia and autism and who cannot be left alone outside his home. Ms. Branham had taken him to the Spear-Zuleta home on several prior occasions and both Chris Spear-Zuleta and Aninha knew Mr. Mike and were familiar with his disabilities. *Tr.* at 28. Throughout the ordeal, Ms. Branham was concerned for Mr. Mike's well-being and, at times, remained compliant with the defendants' demands in order to assure his safety. *Tr.* at *35.*

There is no doubt that the intended victims of the crimes were Ms. Branham and – by extension – Alan Robinson, not Mr. Mike. Nevertheless, when the defendants forced Ms. Branham and Mr. Mike to go to the Milford home so that they could carry out the robbery, Aninha Spear-Zuleta knew full well that Mr. Mike was incapable of objecting and that, even if he had, his disabilities would prevent him from thwarting the robbery or taking any other actions to disrupt the plan.

That Mr. Mike was not the principal intended victim of the robbery and abduction does not relieve the defendant of liability for her conduct. The enhancement is "authorized where the offense conduct victimized a vulnerable person even though the entity directly targeted by the offense of conviction was a different person." *United States v. Kimber,* 777 F.3d 553, 565 (2d Cir. 2015) quoting *United States v. Firment,* 296 F.3d 118, 121 (2d Cir. 2002).

Nor does it matter that the defendant did not deliberately prey on the victim *because* of his vulnerability. "[I]t is sufficient that he knew or should have known of this quality when deciding to go ahead with the crime." *United States v. McCall,* 174 F.3d 47, 50 (2d Cir. 1998). The focus is not on the potential harm to which the vulnerable person might be exposed, but whether "a particular victim was likely to thwart the crime …." *Id.* In determining whether to

impose this enhancement, the sentencing court should focus "on the extent of the individual's ability to protect himself from the crime." *United States v. O'Neil,* 118 F.3d 65, 75 (2d Cir. 1998).

Accepting that Mr. Mike was not the primary target of the robbery, any number of alternatives were available to the defendants to avoid victimizing a disabled man during their kidnapping and robbery. Most obviously, of course, they simply could have decided not to continue with the robbery, knowing that Mr. Mike would now be involved. Alternatively, they could have returned him to his own home before going to Ms. Branham's home to continue the robbery. Instead, knowing his disabilities and undeterred in their plan to carry out Spear-Zuleta's revenge, they chose to prolong Mr. Mike's captivity by taking him to Milford.

## VI.   IMPOSITION OF A REASONABLE SENTENCE UNDER 18 U.S.C. § 3553(a)

In imposing sentence, this Court must consider each sentencing factor set forth in 18 U.S.C. § 3553(a). Most relevant here, are (1) the defendant's history and characteristics, and (2) the nature and circumstances of the offense. Here, the record demonstrates Spear-Zuleta to be an inveterate criminal, having sustained numerous convictions for acts of violence and drug trafficking over a criminal career spanning more than 25 years. As for the crime itself, the Hobbs Act robbery committed here was not merely a crime of opportunity, but an act of psychological terror against Branham, Robinson, and Mr. Mike, as well as an assertion of dominance over codefendants Aninha Spear-Zuleta and Maritza Torres. That conduct was then aggravated by Spear-Zuleta's efforts to conceal it and to evade capture by law enforcement.

### A. Spear-Zuleta's criminal history and character

1. Spear-Zuleta has engaged in serious crime since age 18

Despite falling within CHC VI, the highest recidivist category, Spear-Zuleta's criminal history is not overstated. To the contrary, many of his offenses, though serious, fall outside the Guidelines' parameters for calculating criminal history.

- In 1992, at age 18, he was convicted of burglary; his 13-month sentence was suspended but he was sentenced to serve 6-months' jail for assault. PSR ¶¶ 36, 38.

- In 1993, he spent 90 days in jail for larceny and resisting arrest and was then convicted of assaulting a police officers in different incident that same year, for which he received suspended sentence. PSR ¶ 40, 42.

- In 1994, he was convicted of narcotics possession and for his failure to appear before the court. PSR ¶ 46.

Because of their age, the above offenses were not considered in determining Spear-Zuleta's criminal history score under the Guidelines.

- In 1995, Spear-Zuleta graduated from low-level crimes to egregious felonies. In December he sustained a string of convictions, most notably a gun-related Assault 1, for which he was sentenced to 15 years' imprisonment, suspended after 6 ½ years.[6]

- On the same day, he was also convicted of three separate counts of assaulting an officer, which netted him concurrent 5-year sentences (PSR ¶¶ 44, 51)  and a conviction for escape from custody in the first-degree, which also carried a 5-year concurrent sentence (PSR ¶ 51).

- By 2000, at age 26, Spear-Zuleta was back on the street and selling drugs, which earned him two separate convictions, for which he was concurrently sentenced to 30 months' jail and 5 years' special parole. PSR ¶¶ 52-53.

- In 2001, he committed yet another felony assault, for which he was sentenced to a concurrent term of 1 year. PSR ¶ 54.

- In 2005, apparently while in custody, Spear-Zuleta assaulted State personnel and was sentenced to 54 months' imprisonment. PSR ¶ 55.

---

[6]     Although partially suspended, the 15-year sentence meted down by the Superior Court indicates that the Assault 1 conviction, which also involved a Spear-Zuleta's carrying of a firearm, was a matter of extreme violence, and is entirely consistent with a vicious, merciless character as suggested by his 20-year criminal history and Branham's testimony in this case.

Showing that his string of criminal offenses committed during his 20s and 30s were not aberrative, he committed two sets of offenses in 2013, at ages 39 and 40, that bear directly on his character and on the facts of this case.

First, at 39 years old, he was convicted in connection with committing violence against women: two second-degree assault charges were reduced to a breach of peace offense, but the facts in the PSR confirm that he punched two female employees of Stamford's Crowne Plaza Hotel in the face. Apparently, they had argued with him and knocked over his drink after he refused to leave a New Years' Day event.[7] That conviction was not considered in calculating his Guidelines criminal history score. *See* PSR ¶ 56.

Second, in August 2013, Spear-Zuleta, then aged 40, perpetrated a gun-point assault that led directly to the murder of another person. As described in PSR ¶ 57, on August 20, 2013, Spear-Zuleta and his friend, Angel Morales, were ejected from a Harford night club around 1 a.m. on August 20, 2013, following a dispute inside. Outside, Morales and Spear-Zuleta, who was armed with a handgun, lay in wait, looking to confront the victims as they left the club. When the victims emerged, the resulting argument ultimately led to a fight behind the nightclub, where Spear-Zuleta pulled his gun and pistol-whipped one of the unarmed victims. Apparently, Spear-Zuleta struck the victim so hard that he lost his grip on the handgun. While he was scrambling to retrieve it, the other victim struck him and knocked him unconscious.  In the

---

[7]     While the facts of Spear-Zuleta's attack on two women are not disputed, the offense was reduced to a misdemeanor and received no criminal history points toward Spear-Zuleta's criminal-history calculation under the Guidelines. PSR ¶ 47.

resulting scuffle for Spear-Zuleta's gun, Morales got control of the weapon and shot the victim in the chest at point-blank range, killing him.[8] *See* PSR ¶ 57.

For his role the murder above, Spear-Zuleta received a 2-year suspended sentence. *Id.* Notwithstanding his lack of jailtime, the facts of that offense reveal Spear-Zuleta's character, in escalating a confrontation to the point of murderous violence, and in bringing a gun to a fistfight.

2. 20 years of DOC discipline

During his various periods of incarceration, Spear-Zuleta sustained 28 separate disciplinary tickets – eight of which involved assaults, attempted assaults, or threatening others – including an "attempted assault on a DOC employee" on January 31, 2019, while in custody for the instant offense (for which the resulting discipline was "15 days punitive segregation, 30 days' loss of recreation, and 30 days' loss of social visits."). PSR ¶ 58.

3. Uncharged criminal conduct and prelude to the offense

As discussed in the PSR, in addition to the criminal conduct outlined above, the credible evidence is that Spear-Zuleta and Alan Robinson worked together to traffic cocaine. While it is unclear when that relationship first began, it appears to have been active well-before July 2017, when Spear-Zuleta was still on State probation. Regardless, by the fall of 2017, Spear-Zuleta fell out with Robinson over, among other things, a purported drug debt of $40,000. That circumstance (to which Ashley Branham credibly testified) establishes, by at least a preponderance of the evidence, that Spear-Zuleta's criminal conduct continued unabated well into his 40s.

---

[8]     For his criminal involvement in the murder, Spear-Zuleta was charged only with felony assault in the second-degree and for carrying a dangerous weapon. He was received suspended sentences for those offenses in 2015, resulting only in a single criminal history point for Guidelines purposes.

**B.  Nature and circumstances of the offense.**

1.  <u>The offense – Hobbs Act robbery/home-invasion/kidnapping</u>

The forceful taking that defines all Hobbs Act robbery offenses is, by itself, a serious crime, and worthy of serious punishment. But in this case, the circumstances and scope of the offense reveal it to have been a particularly vicious and cruel act, far beyond the harm typically inflicted in a "stick-em-up" robbery of opportunity.

As outlined above, this robbery, which was in essence a home-invasion, had its genesis in Spear-Zuleta's long-standing cocaine trafficking. To collect the outstanding drug debt Robinson allegedly owed him, Spear-Zuleta determined to threaten, beat, and rob Robinson's fiancé, Ashley Branham.

Branham credibly testified that in the days leading up to the robbery, Spear-Zuleta used his own wife, Aninha Spear-Zuleta, who was Branham's longtime friend, to pressure and cajole her into a meeting. When Branham resisted, Spear-Zuleta personally stalked the Branham-Robinson home, peering in windows and assessing the home's recently installed security system. Wanting to put an end to the intimidation, Branham ultimately agreed to meet with both Spear-Zuleta's at their Rimmon Road home. To ensure her safety, she brought along Mr. Mike, a disabled adult in her care, who was well-known to the Spear-Zuletas. Branham wrongly believed that Spear-Zuleta (by then a convicted woman beater, see PSR ¶ 56) might demonstrate prudence, and stay his rage in the presence of an uninvolved bystander like Mr. Mike.

 After she arrived at Rimmon Road, Branham was separated from Mr. Mike, and taken to the basement, where Spear-Zuleta knocked her to a sofa and began slapping her in the face. He then invited his three accomplices: Aninha, defendant Maritza Torres, and the unidentified male, to join in the beating. As discussed in further detail above, not only did they refuse, but they worked to restrain Spear-Zuleta from beating Branham further.

As if the beating were not clear message enough, Spear-Zuleta made it plain that if Branham resisted or sought help from the police, he would kill not only her but her family too. Not an idle threat from a man who had pistol-whipped an unarmed man in 2013, been convicted and sentenced to serve more than 6 years for a 1995 first-degree assault and suffered 28 disciplinary infractions while in prison.

Spear-Zuleta's accomplices took Branham and Mr. Mike, by force, back to Branham's home, where they robbed her of clothing, valuables, a firearm, and an unsold portion of Robinson's cocaine – all at Spear-Zuleta's direction.

As evident from the totality of the record, this Hobbs Act robbery was part of Spear-Zuleta's concerted effort to instill fear in Branham and Robinson and assert his dominance over them. To inflict this psychological harm, he likewise forced his own wife and Maritza Torres to commit a home-invasion under fear that he would turn his wrath on them.[9] It is also reasonably inferable that he used Branham's fear for Mr. Mike's safety as a further means of control, but at best he acted with callous disregard for the well-being of this particularly vulnerable victim. Finally, he employed an as-yet unidentified coconspirator, who told Branham, unequivocally, that his role was to end Branham's life if Spear-Zuleta ordered it so.

By any measure, the nature and circumstances of the offense show it to have been a particularly brutal and horrifying crime perpetrated with cruelty. The offense, by itself, is worthy of a sentence at least in the range calculated by the Government, particularly in light of Spear-Zuleta's 20-year career of violence. And were those factors not sufficient reason for a Guidelines sentence, the Court should consider Spear-Zuleta's criminality following the offense.

---

[9]     That Spear-Zuleta's violence was a motivating factor in Aninha Spear-Zuleta's and Maritza Torres's decision to join in the Hobbs Act offense, does not exonerate them. They each had opportunities to safely remove themselves from the criminal conduct but chose not to.

2.  <u>Aftermath of the offense - the obstruction of Alan Robinson's killing</u>

Unfortunately, the Hobbs Act robbery was not the final chapter in this story. On April 4, 2017, Robinson was shot to death outside Spear-Zuleta's Woodbridge home on Rimmon Road, with Spear-Zuleta being the principal person-of-interest in that shooting.

Although the circumstances leading to Robinson's death remain under investigation, certain facts are undisputed. Notably, video evidence obtained from Spear-Zuleta's home-surveillance system establishes that he and Robinson exchanged words outside Spear-Zuleta home immediately before Robinson's killing.  That same video system also captured the moments following Robinson's death, during which Spear-Zuleta's wife, Aninha, then runs into their home clutching an object that strongly resembles a firearm in her waistband, shouting "put it where, Chris? Put it where?" Spear-Zuleta can then be heard instructing her to hide the object, telling her to get it "out of the house." By the time police arrived at the scene, both had left the home and the item that Aninha carried into the house has never been found, despite multiple searches of the house.

In addition to ordering his wife to dispose of what was likely a murder weapon, follow-up investigation confirmed that Aninha Spear used her mobile telephone to access and delete certain videos from the home security system. Given that Aninha was taking direction from her husband in the immediate aftermath of Robinson's death, the credible evidence supports the view that his obstructive conduct included directing her in the deletion of video evidence.

Having directed the destruction of potentially damning murder evidence, Spear-Zuleta then abandoned his wife and family, driving not only away from Robinson's body but fleeing Connecticut altogether.

3. <u>Other relevant offense conduct – Spear-Zuleta's flight and evasion of law enforcement</u>

On or about May 29, 2018, with her husband on the run, Aninha Spear was arrested on criminal charges related to the Hobbs Act robbery and kidnapping that forms the basis for the federal indictment. At the same time, a State arrest warrant issued for Spear-Zuleta as her co-defendant.

There is no dispute that Aninha Spear was aware that her husband was a fugitive with an active warrant for his arrest: she was told so by Connecticut State Police. As thoroughly described in the Government's Supplemental Memorandum in Opposition to the Defendant's (Aninha) Release Motion and In Support of Continued Pretrial Detention, docket no. 66, throughout Spear-Zuleta's time on the run, he and Aninha conspired to meet one another using aliases, booking one-way flights, using pre-paid burner phones, vehicles registered by confederates, and other means to thwart the federal and state manhunt.

With an active warrant for his arrest, Spear-Zuleta evaded law enforcement for months. In late 2018, the Federal Bureau of Investigation and the United States Marshal Service began a fugitive investigation to assist State law enforcement in capturing Chris Spear, and in furtherance of the parallel federal investigation. Federal agents ultimately tracked to Spear to a safe house in Miami, Florida, where it was believed he was hiding from sometime in May 2018, after the Robinson murder, through October/November 2018, when he likely learned that investigators were closing in. He then fled to San Francisco, California, where he was apprehended on December 22, 2018. At the time of his arrest, Spear-Zuleta was using the alias Omar Garcia-Garcia.

To further underscore his character, he told the arresting agents, that in his younger days he would have opened fire on them.

In accordance with U.S.S. G. § 1B1.4, Spear-Zuleta's obstruction and evasion should properly be considered aggravating relevant conduct in determining where within the Guidelines he should be sentenced.

### C.  The remaining § 3553(a) sentencing factors.

For the reasons discussed above, a Guidelines sentence is sufficient but not greater than necessary to achieve the aims of sentencing. Specifically, a Guidelines sentence addresses the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment.

Moreover, a Guidelines sentence is plainly necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, particularly here, where Spear-Zuleta has a 25-year history of criminal activity. Indeed, because he has never served a sentence longer than 78 months (the top-end of the defendant's erroneously calculated range here), a departure or non-Guidelines sentence, as consistent with defendant's request for nothing more than a 78-month sentence, is clearly insufficient to deter the defendant or to protect the public; nor is it consistent with the aims of incremental sentencing. Finally, a Guidelines sentence consistent with the Government's calculation is adequate to provide the defendant with needed educational or vocational training, is within the kinds of sentences available for the offense and comports with sentencing policy.

VII.   **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a

sentence in the recommended Sentencing Guidelines range of 168 to 210 months' imprisonment.

Respectfully submitted,

LEONARD C. BOYLE
ACTING UNITED STATES ATTORNEY

_____/s/_____
JOSEPH VIZCARRONDO
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT 06510
FEDERAL BAR NO. PHV 04521
Tel.: (203) 821-3700
Fax: (203) 773-5378
joseph.vizcarrondo@usdoj.gov

## <u>CERTIFICATION</u>

I hereby certify that on April 19, 2021, a copy of the foregoing sentencing memorandum was filed electronically, sent via e-mail to defense counsel, and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/
_____
JOSEPH VIZCARRONDO
ASSISTANT UNITED STATES ATTORNEY
